Peter Gabriel John McMULLEN,
Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 80–7580.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 13, 1981.

Decided Oct. 13, 1981.

Bill Ong Hing, Nancy Howard, Lynn Sonfield, San Francisco, Cal., for petitioner.

Daniel E. Fromstein, Washington, D. C., for respondent.

Before CHOY, HUG and SCHROEDER, Circuit Judges.

CHOY, Circuit Judge:

## I. *Introduction*

Peter Gabriel John McMullen, an alien, claimed that he should not be deported to the Republic of Ireland[1] because he would be persecuted for his political beliefs if he returned there. The immigration judge agreed and granted McMullen's application for withholding of deportation. Upon appeal by the Immigration and Naturalization Service (INS), the Board of Immigration Appeals (the Board) reversed the decision of

---

1. McMullen claims citizenship in both the United Kingdom and the Republic of Ireland, but the Board decision under review here deals only with the question of deportability to the Republic of Ireland. The parties apparently agree that the INS is free to bring subsequent proceedings for deportation to the United Kingdom should it fail in the instant case.

the immigration judge, concluding that McMullen had not shown sufficient likelihood of persecution. We grant McMullen's petition for review on the ground that the Board's decision was not supported by substantial evidence.

## II. *Factual Background*

The following facts are substantially undisputed: McMullen was born in Northern Ireland and reared in Great Britain. He is a Catholic of Irish descent, but he was not politically or emotionally involved with the Irish independence movement during his youth in Great Britain. He joined the British Army and eventually entered a paratrooper unit. McMullen was sent to Northern Ireland in 1969 as part of British peacekeeping efforts.

During the 1960's, the Catholic minority in British-controlled Northern Ireland became increasingly vocal in its civil rights claims. The Irish republican movement called for independence from Great Britain and unification of Northern Ireland and the southern Republic of Ireland.

McMullen began to feel that the British Army was anti-Catholic. He claims that he became personally aware of army torture of prisoners and of army plans to use armed force against unarmed civilian demonstrators in order to provoke and draw out an underground group, the PIRA.

The PIRA, or the Provisional Irish Republican Army, is an off-shoot of the paramilitary Irish Republican Army (IRA). These groups arose out of the republican movement. They are not officially supported by any government. They purport to protect the Catholic population from the British Army, and to work, with violence if necessary, toward the unification and independence of Ireland. The PIRA, also referred to as the "provisionals," formed in protest to the perceived inefficacy of the IRA.

When McMullen learned of the Army's plan to confront civilian demonstrators, he deserted the British Army and joined the PIRA. He participated in a bombing of army barracks, and became well known for his attempts to forestall the attack against the demonstrators. The confrontation in fact took place, and 13 civilians were killed in what became known as Bloody Sunday.

McMullen participated actively in PIRA operations until the group became, in his view, extremist, terroristic and out of touch with the civilian populace. In September of 1974, he formally resigned from the PIRA. The following month, McMullen was arrested by the Garda, or Republic of Ireland police, in connection with his past PIRA activities. He was imprisoned for three years, during which time he was held in the maverick wing, segregated from PIRA-member prisoners.

Upon his release in 1977, McMullen was asked to help the PIRA, but he declined to assist them. After repeated PIRA intimidation, including an incident in which he claims he was kidnapped at his place of employment and driven to a remote area, McMullen agreed to help. He occasionally housed PIRA members in his home and made trips to the United States, apparently to obtain guns. But when the PIRA ordered McMullen to plan and execute the kidnapping of an American bar owner, he refused. A PIRA court of inquiry reviewed McMullen's conduct, and, McMullen testified, a friend warned him that he would be murdered for his disobedience. McMullen then fled to the United States, using an assumed name to obtain a visa. When he arrived, he contacted the Bureau of Alcohol, Tobacco & Firearms, hoping to obtain asylum in exchange for sharing his knowledge of PIRA activities. He cooperated with the Bureau and with Scotland Yard investigators in the United States.

The INS then brought deportation proceedings against McMullen. McMullen testified at the proceedings, explaining that the PIRA was aware of his cooperation with authorities, and that he was considered a traitor who should be executed. McMullen submitted over 100 pages of exhibits consisting of newspaper and magazine articles, scholarly reports, and other publications documenting PIRA terrorist activities.

The immigration judge found that McMullen was not deportable because "the Government of the Republic of Ireland is unable to control the activities of the PIRA and that if [he] were to be returned to that country he would suffer persecution within the meaning of the [United Nations] Convention, Protocol, and section 243(h) [of 8 U.S.C. § 1253(h)]." The immigration judge further found that McMullen was not a security risk to the United States and that therefore deportation should be withheld.

On October 1, 1980, the Board of Immigration Appeals reversed, finding that McMullen had not shown a sufficient likelihood that he would suffer persecution upon deportation to Ireland. This petition followed.

### III. *Issues*

The questions this court must answer are:

1. What is the appropriate standard of review of a Board of Immigration Appeals finding of no likelihood of persecution under the Refugee Act of 1980?

2. Was the Board's finding that McMullen did not show a likelihood of persecution supported by the evidence viewed under the appropriate standard of review?

### IV. *Discussion*

McMullen admits that he entered the United States illegally, and that but for the provisions of the Refugee Act of 1980, he would be deportable. The Government agreed to presume that the Act has retroactive effect. Thus the only issue below was whether or not McMullen was entitled to the protection of the Act, which reads in relevant part:

(h)(1) The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in

a particular social group, or political opinion.

(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—

(A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

(B) the alien, having been convicted by a final judgment of particularly serious crime, constitutes a danger to the community of the United States;

(C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.

Refugee Act of 1980, § 243(h), 8 U.S.C. § 1253(h) (Supp. 1 1981) (hereinafter "§ 243(h)").

■ The elements necessary to withholding of deportation of McMullen are:

1. A likelihood of persecution; *i. e.,* a threat to life or freedom.

2. Persecution by the government or by a group which the government is unable to control.[2]

3. Persecution resulting from the petitioner's political beliefs.

4. The petitioner is not a danger or a security risk to the United States.

The immigration judge found here all four of these elements. The Board found that the first two elements were not proved and therefore it did not reach the remaining two. The instant petition calls upon us to review only the Board's findings that McMullen was not likely to suffer persecution by the government of the Republic of Ireland or by the PIRA.

---

**2.** The Government concedes that persecution within the meaning of § 243(h) includes persecution by non-governmental groups such as the

PIRA, where it is shown that the government of the proposed country of deportation is unwilling or unable to control that group.

## A. *Standard of Review*

We must first determine the appropriate standard of review applicable to a Board finding that no likelihood of persecution exists under § 243(h). Because the statute was significantly amended in 1980, this question is one of first impression.

Prior to enactment of the present § 243(h), withholding of deportation was at the discretion of the Attorney General. The former section read:

> The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which *in his opinion* the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason. (Emphasis added.)

Immigration and Nationality Act, Pub.L. No. 82–414, § 243(h), 8 U.S.C. § 1253(h), 66 Stat. 212 (1952). Decisions under the former section were subject to very limited review. This court gave extreme deference to the Attorney General's decision, searching only for a lack of due process or an abuse of discretion, and refusing to apply substantial-evidence review to a Board finding of ineligibility for § 243(h) relief. *See, e. g., Kasravi v. Immigration and Naturalization Service,* 400 F.2d 675, 677 (9th Cir. 1968); *Asghari v. Immigration and Naturalization Service,* 396 F.2d 391, 392 (9th Cir. 1968); *Namkung v. Boyd,* 226 F.2d 385, 388–389 (9th Cir. 1955).

The INS argues that the abuse-of-discretion standard, which the Ninth Circuit previously applied in § 243(h) cases, remains applicable, and that therefore this court should defer to the Board's no-likelihood-of-persecution finding. McMullen, on the other hand, argues that the new, mandatory language of § 243(h) justifies replacing the abuse-of-discretion standard with the substantial-evidence standard.

We agree with McMullen. The role of the reviewing court necessarily changes when the charge to the agency changes from one of discretion to an imperative. In past cases, this court recognized that its limited role was a direct result of the discretionary language of the statute. In *Kasravi v. INS, supra,* we stated:

> By finding that the petitioner is not "statutory eligible" for relief it might appear that the special inquiry officer was making a finding of fact based upon an evaluation of the record before him. *If such a finding of fact were required by the statute, the decision of the Attorney General would be subject to review in order to determine whether such finding were supported by reasonable, substantial and probative evidence.* Title 8 U.S.C. § 1105a(a)(4). However, Congress has made it abundantly clear by the express wording of the statute that no such finding is contemplated or required. It left to the broad discretion of the Attorney General the authority to suspend deportation in such cases . . . . (Emphasis added.) (Footnote omitted.)

400 F.2d at 677. The new § 243(h) removes the absolute discretion formerly vested with the Board. A factual determination is now required, and the Board must withhold deportation if certain facts exist. This change requires judicial review of the Board's factual findings if the 1980 amendment to § 243(h) is to be given full effect. Agency findings arising from public, record-producing proceedings are normally subject to the substantial-evidence standard of review. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). The INS does not cite any portion of the legislative history of the 1980 amendment which suggests that, contrary to normal principles of administrative law, § 243(h) factual findings are discretionary.

We conclude that factual findings under § 243(h) are subject to review under the substantial-evidence test. Because this conclusion follows from legislative changes in the section it does not conflict with prior Ninth Circuit precedent and, contrary to the argument of the INS, it is not necessary to consider this question en banc. Indeed, our prior cases recognized that the substantial-evidence test applies when agency factual findings are required. *See Kasravi v. INS,* 400 F.2d at 677.

■ Application of the substantial-evidence test does not mean, of course, that the reviewing court must review the facts de novo. The principle of deference to agency expertise is still applicable, and our inquiry is limited to a review of the record to determine whether the agency's determination is substantially supported.

### B. *Likelihood of Persecution*

■ Having determined the appropriate standard of review, we now ask whether the Board's finding of no likelihood of persecution in McMullen's case was supported by substantial evidence. Our review of the record convinces us that it was not. *See Calhoun v. Bailer*, 626 F.2d 145, 148 (9th Cir. 1980) ("the substantial evidence test is quintessentially a case-by-case analysis requiring review of the whole record").

Evidence supporting McMullen's claims consisted of his lengthy and detailed personal testimony, both written and delivered in hearings under direct and cross-examination; letters from family members; newspaper and magazine articles; book excerpts; investigative reports; and transcripts of related proceedings. The evidence may be categorized according to the elements McMullen sought to prove: first, that the PIRA systematically tortures and murders traitors; second, that McMullen is perceived as a traitor; and, finally, that the government of the Republic of Ireland is not able to control the PIRA. McMullen also attempted to prove that the Republic of Ireland through its police force—the Garda—would persecute him directly as a former PIRA member.

■ The INS attacks McMullen's case by noting, correctly, that the burden of proof was upon McMullen to prove a likelihood of persecution. The Board found that McMullen's personal testimony was not credible because it was self-serving, and that the articles and reports generally documenting PIRA terrorism were irrelevant because they did not refer specifically to persecution directed at McMullen. The INS did not submit evidence of its own which indicated that any of McMullen's exhibits were inaccurate, nor did it submit independent evidence showing McMullen's lack of credibility.

McMullen concedes that the burden is on the alien to prove likelihood of persecution and submits that he met this burden. We agree.

We begin with a review of McMullen's testimony that the PIRA has specifically threatened his life, that he resigned without permission from the PIRA and refused to carry out its orders, that he has given information about the PIRA to the United States Government and to Scotland Yard, and that the PIRA considers him a traitor. This testimony is supported by the record. McMullen was for a time in protective custody of the Bureau of Alcohol, Firearms and Tobacco, and Scotland Yard agents were present at his initial deportation proceedings. McMullen's activities, including that which would classify McMullen as an informer, have been reported by the press in the United States and abroad.[3] When McMullen was imprisoned in the Republic of Ireland, he was segregated from PIRA prisoners, and the public record in McMullen's extradition proceedings further characterizes McMullen as a PIRA defector. The INS points to one article out of the many submitted by McMullen which cites an unidentified IRA source's denial of "interest" in McMullen. The general thrust of this San Francisco Chronicle article supports McMullen's story that he defected from the PIRA, and it states that the PIRA considers McMullen a "criminal element." At best, the article can be characterized as ambiguous.

■ The INS submits no evidence contradicting McMullen's claim that he refused to carry out the PIRA's orders, and indeed, it never seriously disputed the truth of McMullen's claimed history of PIRA association and defection. The INS argues simply that McMullen's testimony is inherently

---

**3.** The record contains, *inter alia*, specific references to McMullen's PIRA-related activities in the Hibernia Review, the San Francisco Sunday Examiner & Chronicle, and the Irish Times.

unbelievable—not because it is internally inconsistent or lacking in the ring of truth—but because a petitioner in a deportation case is motivated to lie in support of his own case. We note that the immigration judge, who heard McMullen testify and observed his demeanor, found McMullen's testimony credible. When the immigration judge and the Board conflict, we may properly consider the judge's finding. *Cf. Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951) (recognizing that in applying the substantial-evidence test in the labor context that "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's"). We examine also the nature of the sworn testimony—its considerable length; its reference to specific dates, places, incidents, details, and motivations; and its consistency under cross-examination—which indicates that McMullen is either an elaborate and skilled liar, or that he was telling the truth. While our role is not to make an independent finding of credibility, we must review McMullen's evidence to determine whether the Board's rejection of it was reasonably supported. *See Carter Products Inc. v. Federal Trade Commission*, 268 F.2d 461, 493 (9th Cir.), *cert. denied*, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959) (reviewing court applying substantial-evidence test must consider evidence contravening the agency's determination).

Given the nature of McMullen's testimony, the immigration judge's finding of credibility, and the absence of any significant contradictory evidence, we are convinced that McMullen met his burden of showing that the PIRA considers him a traitor, and that any finding to the contrary would be unsupported.

We next consider McMullen's documentation of PIRA practices. McMullen's exhibits[4] confirm that the PIRA regularly maims and executes informers and persons it considers disloyal. The exhibits specify names, dates and places of these incidents which clearly indicate a pattern in the PIRA's activity. This evidence, which is nowhere contradicted in the record, indicates that the PIRA is a clandestine, terroristic organization which is not subject to government control. Evidence of a pattern of uncontrolled PIRA persecution of defectors is relevant in determining whether McMullen is likely to face persecution upon deportation.

We consider now the remaining reasons submitted by the INS for rejecting McMullen's claim. The INS argues that since McMullen chose deportation to the Republic of Ireland over deportation to the United Kingdom in earlier proceedings, he must not have had a genuine fear of persecution in the Republic of Ireland. McMullen testified that as a tactical matter he chose Ireland over England where he would face certain persecution. His first choice, however, was always to stay in the United States and to seek protective custody. We agree that in light of the overwhelming evidence supporting McMullen's claims, the designation of the Republic of Ireland in earlier proceedings has little or no probative value.

The INS further notes that McMullen's family apparently resides unharmed in the Republic of Ireland. McMullen's exhibits indicate that the PIRA operates under its own well-developed code of "justice" and that it is very specific in its choice of victims, with particular punishments reserved for particular offenses.[5] There is no evi-

---

4. McMullen's extensive exhibits contain, *inter alia*, reports of PIRA executions and torture of informers and opponents from The London Sunday Times, Time Magazine, The Informer, Newsweek, The Los Angeles Times, the New York Times; a study by the Institute for Military Studies, University of Lancaster, England; the Amnesty International reports on the Republic of Ireland; and Deutsch and Magowan,

*Northern Ireland 1968–74, A Chronology of Events.* The INS did not challenge the accuracy of these reports.

5. For example, informers are "knee-capped" or killed; women guilty of fraternization are tarred and feathered. Knee-capping is crippling by shooting into or crushing the victim's knees.

dence that family members of informers are also attacked. The fact that McMullen's family is safe does not refute McMullen's claims.

Finally, the INS would discount the letters from family members as prompted by McMullen. There is no independent evidence that the letters are false, and they do indicate that McMullen spoke of the threats to his life prior to his arrival in the United States; *i. e.*, that his story is not a recent fabrication. While the inference exists that family members would tend to write whatever they believe will help McMullen, in a case of this sort it is difficult to imagine what other forms of testimony the petitioner could present other than his own statement and those of family members. Members of the underground PIRA obviously would not testify or otherwise make public their intentions, and McMullen was not likely to share his fears and plans of escape with many people. The PIRA's terrorist practices are also likely to discourage testimony from knowledgeable and sympathetic third parties, such as the friend who McMullen claims told him of the PIRA's plan to execute McMullen. Further, even if the letters are ignored, we find that the remainder of McMullen's uncontroverted evidence is sufficient to prove his case.

The Board rejected McMullen's evidence without suggesting what further proof it would require in a case of alleged persecution by a clandestine, terrorist group. If McMullen, a well known former PIRA member with an extensively documented claim of probable persecution, failed to present sufficient proof, then it appears close to impossible for anyone in McMullen's position to make out a § 243(h) case. *Cf.* United Nations High Commissioner for Refugees Handbook on Procedure and Criteria for Determining Refugee Status, ¶ 196, p. 47 (1979) (noting that refugees fleeing political persecution are often limited in the evidence they can submit to support their claims).

We conclude that the Board's reasons for rejecting McMullen's extensive and persuasive testimony and exhibits are unconvincing, and that the Board's decision was not supported by substantial evidence on the record viewed as a whole.

## V. *Conclusion*

We hold that a Board finding of no likelihood of persecution under § 243(h) is subject to review to determine whether it is supported by substantial evidence. The Board's finding here does not meet this test.

The question of whether McMullen's break from the PIRA because of philosophical differences represents a political belief within the meaning of § 243(h), and the question of whether McMullen represents a danger to the United States are not presently before us. We decide only that insofar as the question of likelihood of persecution by the PIRA [6] is concerned, McMullen's petition is GRANTED.

---

**6.** We need not and do not reach the question of whether the Board's rejection of McMullen's alternate claim that he will be persecuted by the official Republic of Ireland police—the Garda or Gada—is supported by substantial evidence.