Elisida ZAVALA–BONILLA, Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 82–7686.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1983.

Decided April 10, 1984.

Timothy S. Barker and Linton Joaquin,
National Immigration Law Center, Mathew
L. Millen, Los Angeles, Cal., for petitioner.

Ingrid Hrycenko, Asst. U.S. Atty., Los
Angeles, Cal., for respondent.

Before SKOPIL and PREGERSON, Cir-
cuit Judges, and MARQUEZ, District
Judge.*

* The Honorable Alfredo C. Marquez, United
States District Judge for the District of Arizona,

sitting by designation.

PREGERSON, Circuit Judge:

Elisida Zavala-Bonilla petitions for review of a decision of the Board of Immigration Appeals (BIA) denying her applications for political asylum and suspension of deportation. For the reasons stated below, we reverse and remand for further proceedings.

Zavala-Bonilla, a native and citizen of El Salvador, has lived in the United States since 1969. While in El Salvador, she earned her living as a textile worker. She was also a trade union member in El Salvador for nine years, including three as a union executive, and she actively participated in her union's activities, including a nationwide strike in 1969. During the strike, she was confronted by the police and ordered to cease picketing. In the strike's aftermath, two union officials were killed. She left El Salvador and shortly thereafter entered the United States. Since her arrival in the United States, Zavala-Bonilla's union has joined a large anti-government coalition.

Zavala-Bonilla conceded deportability at her deportation hearing on August 29, 1978. Later, she submitted sworn applications for suspension of deportation and political asylum. Her asylum application was supported by four letters from friends in El Salvador, a letter from her union, and numerous press and international organization accounts of oppressive conditions in El Salvador.

Zavala-Bonilla's application for asylum was forwarded to the U.S. State Department for an advisory opinion, as required by 8 C.F.R. § 208.10(b) (1983). The State Department determined that if Zavala-Bonilla's assertions were true, she has a well-founded fear of persecution if she returns to El Salvador.

The Immigration Judge (IJ) denied the asylum application. He found that Zavala-Bonilla failed to sustain her burden of proof on the issue of well-founded fear of persecution. The IJ also denied her application for suspension of deportation.

The BIA affirmed both denials. With respect to the asylum application, the BIA discounted the evidence submitted by Zavala-Bonilla. The BIA concluded that the asylum claim was deficient because it was not supported by objective evidence. The BIA found the general accounts of conditions in El Salvador submitted by Zavala-Bonilla to be of minimal significance because those accounts did not show that she in particular would be persecuted. The BIA also waved aside the four letters from Zavala-Bonilla's friends as gratuitous and non-specific. Finally, the BIA found that the State Department's advisory opinion was undercut by "discrepancies" in Zavala-Bonilla's testimony, and stated that "the marked discrepancies between [Zavala-Bonilla's] sworn answers in her asylum application and her sworn testimony at the hearing demonstrate that her credibility is, at best, highly suspect." The BIA also affirmed the IJ's denial of suspension of deportation on the ground that the extreme hardship claim was based on the political persecution claim that the BIA had denied.

Zavala-Bonilla now pursues relief in this court, contending that the BIA erred in affirming the IJ's adverse rulings on the asylum and suspension of deportation issues.

I

Asylum Issue

The provision of the immigration laws under which Zavala-Bonilla requests asylum, 8 U.S.C. § 1253(h) (1982),[1] was

---

1. Suspension of deportation is available if the alien demonstrates: (1) seven years continuous presence in the United States; (2) good moral character during that time; and (3) extreme hardship "to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1254(a)(1) (1982).

An application for political asylum filed, as here, during deportation proceedings is considered as an application for "withholding of deportation" under 8 U.S.C. § 1253(h) (1982). 8 C.F.R. § 208.3(b) (1983). Although technically called requests for "withholding of deportation," such requests are considered, and actually are, requests for asylum. This opinion, therefore,

amended in 1980 to "remove[ ] the granting of political asylum from within the discretion of the BIA. The Board *must* withhold deportation if certain facts exist ...." *Chavez v. I.N.S.*, 723 F.2d 1431, 1432 (9th Cir.1984). We review the record to determine whether the BIA's decision is supported by substantial evidence. *McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir.1981).[2]

The asylum evidence falls into three categories: (1) general accounts of oppressive conditions in El Salvador, including information that unions and union members are mistreated; (2) accounts of Zavala-Bonilla's union membership and activities and her confrontation with the state police during a general strike; and (3) the U.S. State Department's opinion letter supporting Zavala-Bonilla's political persecution claim.

■ The BIA does not dispute the general accounts of oppressive conditions in El Salvador but discounts the information as ı ı-specific to Zavala-Bonilla's case. We believe, however, that general information concerning oppressive conditions is relevant to support specific information relating to an individual's well-founded fear of persecution. *See Stevic v. Sava*, 678 F.2d 401, 406 (2d Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983) (conditions in country of origin relevant to issue of "well-founded fear of persecution"); *cf. Martinez-Romero v. INS*, 692 F.2d 595 (9th Cir.1982) (holding that evidence of general oppressive conditions in country to which alien would be deported is not sufficient standing alone to preclude deportation; "some" special circumstances need be present). We now turn to the specific information submitted by Zavala-Bonilla.

---

refers to Zavala-Bonilla's claim as a request for asylum.

In relevant part, 8 U.S.C. § 1253(h) mandates that:

(h)(1) The Attorney General *shall not* deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

(Emphasis added.)

The alien's burden of proof on an application for asylum or withholding of deportation is currently uncertain because of a dispute over the effect of the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980) (amending the Immigration and Nationality Act of 1952). The Refugee Act amended the wording of then existing requirements for political asylum to conform to the wording of an international human rights protocol. The prior wording required the alien to show a "clear probability" of persecution. The current language requires that the alien show a "well founded fear" of persecution. 8 U.S.C. § 1101(a)(42)(A) (1982) (defines "refugee" for asylum purposes). The parties argue the issue extensively in their briefs, and the issue is before the United States Supreme Court in *Stevic v. Sava*, 678 F.2d 401 (2nd Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983). Zavala-Bonilla argues that she must show a "well-founded fear" of persecution, which *Stevic* holds is a more lenient standard of proof than that required by the previous "clear probability" of persecution standard. The INS contends that the Refugee Act of 1980 did not alter the burden of proof on the alien,

which the INS contends remains the same as it was prior to the Act's passage regardless of whether the standard of proof is labeled "clear probability" or "well-founded fear" of persecution. *See Rejaie v. INS*, 691 F.2d 139 (3d Cir. 1982). Thus the INS argues essentially that petitioner must show a "clear probability" of persecution, which standard the INS contends the Refugee Act of 1980 merely relabeled.

While this court believes the Second Circuit's reasoning in *Stevic* is correct with respect to the meaning of the "well-founded fear" standard in asylum/withholding of deportation cases under the Refugee Act of 1980, the issue need not be addressed here. *See infra*, note 2.

2. Ordinarily, our review of the administrative record for substantial evidence to support an INS decision will be affected by the burden of proof borne by the applicant. Thus, the dispute over the difference between a "well founded fear" and a "clear probability" of persecution, *see supra* note 1, could conceivably affect our assessment of whether the BIA's findings in rejecting Zavala-Bonilla's application were supported by substantial evidence. Here, however, the BIA's findings rest almost entirely on its credibility determination. As discussed in the text of this opinion, those findings are not supported by the evidence regardless of the applicable burden of proof cast upon Zavala-Bonilla. *See Shoaee v. INS*, 704 F.2d 1079, 1084 (9th Cir.1983) (asylum case burden of proof issue need not be reached because claim fails under either standard); *cf. McMullen v. INS*, 658 F.2d 1312, 1317 (9th Cir.1981) (burden of proof construed under general "likelihood of persecution" standard; BIA's findings held unsupported).

To begin with, she submitted four letters from her friends and a fifth from her union in El Salvador. The BIA thought that the letters were "deficient" because they were uncertified copies and "not sworn to as being accurate and made by a competent translator." However, the copies were certified by Zavala-Bonilla's attorney, and two of the five letters had certified translations. Regardless of this, the Immigration and Naturalization Service (INS) employs numerous translators, including the one present at Zavala-Bonilla's hearing, who could easily have verified the translations' accuracy.

■ Moreover, the BIA denigrated the letters as gratuitous speculations that refer only generally to Zavala-Bonilla's past union activities, the current unemployment situation and human rights violations in El Salvador, and possible dangers Zavala-Bonilla would face were she to return to her native land. The record, however, does not support the BIA's treatment of the letters. There is no evidence that the letters are false. While one might infer that her friends in El Salvador would tend to write supportive letters, it is difficult to imagine, given her circumstances, what other forms of testimony Zavala-Bonilla could readily present. She could hardly ask the authorities in El Salvador to certify that she would be persecuted should she return. Furthermore, the letter writers undoubtedly placed themselves at risk merely by writing. Their understandable fear of reprisal may also account for the letters' lack of specificity. The letters do clearly indicate that Zavala-Bonilla was a union activist in El

Salvador. We also note that because Zavala-Bonilla's former union is opposed to the existing government, members may be reticent to divulge union affiliation and union activities in letters addressed to Zavala-Bonilla. See McMullen, 658 F.2d at 1319 (letters from family members improperly discounted by the INS given petitioner's fear of persecution by terrorist group).

Additionally, the BIA concluded that even if current leaders of Zavala-Bonilla's union were subject to political persecution, she personally had nothing to fear because her union joined an anti-government coalition after she left El Salvador. This conclusion is not supported by substantial evidence. The evidence indicates that members of Zavala-Bonilla's union were persecuted before joining the anti-government coalition and that Zavala-Bonilla herself was confronted and harassed by state police during a strike.

The BIA also concluded that "the record simply presents nothing to indicate a continuing and contemporaneous cognizance of the respondent and her past activities ...." Regardless of the applicable burden of proof in political asylum cases,[3] proof of "continuing and contemporaneous cognizance" is not required to show a likelihood of persecution. Requests for asylum are to be considered on a case-by-case basis requiring review of the whole record. See McMullen, 658 F.2d at 1317.[4] Further, the BIA disregarded general accounts of oppressive conditions in El Salvador that indicate an increase in attacks on unions and heightened persecution of union members. The BIA also ignored the letters from Za-

3. Compare Stevic v. Sava, 678 F.2d 401 (2nd Cir.1982) cert. granted, —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983) (change in statutory language from "clear probability" to "well-founded fear" imposed lesser burden of proof on political asylum applicant), with Rejaie v. INS, 691 F.2d 139 (3rd Cir.1982) (change in statutory language did not change burden of proof). See supra note 1.

4. The BIA relies on a Fifth Circuit case for the proposition that a "continuing and contemporaneous cognizance" is required to show a likelihood of persecution. That case is Fleurinoi v. INS, 585 F.2d 129, 134 (5th Cir.1978) (asylum

denied; previous arrest in Haiti not shown to be politically motivated). The case does not stand for the proposition asserted. The Fifth Circuit required that the petitioner show that the Haitian government remember him, not that the government had a "continuing and contemporaneous cognizance" of him.

Further, we decline to follow the holding of the Fifth Circuit to the extent that it requires a petitioner to present "proof" that a government remember him or her in order to show fear of persecution. See McMullen, 558 F.2d at 1317 (likelihood of persecution is decided on a case-by-case basis).

vala-Bonilla's friends indicating the belief that her life might well be endangered should she return to El Salvador.

The BIA also discerned "discrepancies" in Zavala-Bonilla's testimony and concluded that she was not a credible witness. On this basis, the BIA disregarded the State Department's advisory opinion which stated that if Zavala-Bonilla's contentions were true, she had a well-founded fear of persecution. To support its conclusion that Zavala-Bonilla was not credible, the BIA pointed to three purported conflicts between her hearing testimony and her political asylum application. In our view these "discrepancies" were insufficient to undermine her credibility. First, in response to a question on the asylum application inquiring about her political activity, Zavala-Bonilla stated: "As a director of [a labor union] I helped bring about a work stoppage in support of strikers and the State Police ended up killing over one hundred persons. I was mistreated by the State Police in the company of my comrades." The BIA found that she failed to refer to this incident at the hearing. The finding is incorrect. Consistent with her application, Zavala-Bonilla testified before the IJ about her union's sympathy strike in support of the 1969 teacher's strike, her mistreatment by the State Police, and her co-workers who "disappeared."

Second, in response to a question on the application concerning her affiliation with organizations in El Salvador, Zavala-Bonilla stated: "I belonged to a labor syndicate ... from 1961–1969 .... We had to always hide from the State Police as we fought against the injustices committed against the workers." The BIA found that "her testimony [before the IJ] reflects that she was openly involved in public activities such as distributing leaflets and picketing, and makes no mention of police surveillance or the need to secrete herself to preserve her safety." Again, the BIA's

finding is incorrect. Leafletting and picketing are not inconsistent with fighting "injustices committed against workers." And, nothing in Zavala-Bonilla's testimony contradicts the statement that "We had to always hide from the State Police...." Consistent with that statement she did testify that she fled El Salvador after her confrontation with the police because she feared for her safety.

Third, in response to a question concerning the safety of her family in El Salvador, Zavala-Bonilla stated in her application: "My children live under false names so as to insure that they are not subjected to reprisals by my enemies." The BIA found that her testimony at the hearing before the IJ contradicted this assertion. The BIA's finding is not supported by the record. During cross-examination conducted before the IJ, Zavala-Bonilla was asked if her children used the name "Zavala." She answered that they did. Further testimony discloses that she understood the question to ask whether her children *ever* use the name "Zavala." Since her children use "Zavala" whenever they write to her, she answered the question affirmatively. Moreover, she earlier testified on direct examination that her children, as a precaution, do not use their mother's name publicly. Despite a confusing series of questions, objections, translations, and answers, Zavala-Bonilla's testimony overall does not contradict her asylum application statements concerning names used by her children in El Salvador.

In short, on close examination, the three "discrepancies" cited by the BIA do not demonstrate that Zavala-Bonilla lacked credibility. Thus, the underlying premise of the State Department's advisory opinion—that Zavala-Bonilla's claims, if true, present a well-founded fear of persecution—was not undermined, and the BIA should have regarded that opinion with deference.[5]

---

**5.** In the alternative, the BIA's opinion states that the BIA also considered Zavala-Bonilla's contentions as if they were true. The BIA nonetheless determined that Zavala-Bonilla did not qualify for asylum. However, in making this determination, the BIA failed to consider the State Department's advisory opinion, which states that Zavala-Bonilla qualifies for asylum if her allega-

We conclude, therefore, that the BIA's decision denying the political asylum application is not supported by substantial evidence. On remand, the BIA should fully consider the letters from Zavala-Bonilla's friends and her union. The BIA should also consider, with deference, the State Department's advisory opinion, particularly in light of the fact, acknowledged by the Government at oral argument, that Salvadoreans rarely receive a State Department opinion supportive of a political asylum application.[6] Finally, in considering the record as a whole, the BIA should bear in mind the difficulties an alien encounters in providing proof of potential persecution. *See McMullen*, 658 F.2d at 1319; United Nations High Commissioner for Refugees' *Handbook on Procedures and Criteria for Determining Refugee Status* (Geneva 1979) (because aliens have difficulties in collecting proof, credible accounts should be given the benefit of the doubt).[7]

## II

### Suspension of Deportation

The Attorney General may suspend deportation if an alien demonstrates: (1) seven years continuous presence in the United States; (2) good moral character during that time; and (3) extreme hardship "to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence ...." 8 U.S.C. § 1254(a) (1982). The IJ found that Zavala-Bonilla is a person of good moral character and has the required period of continuous physical presence in the United States. Thus, only extreme hardship to Zavala-Bonilla is at issue here. We review the BIA's finding of no extreme hardship for an abuse of discretion. *INS v. Wang*, 450 U.S. 139, 145, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1980). The BIA, however, must consider all factors relevant to the hardship determination. *Contreras-Buenfil v. INS*, 712 F.2d 401, 403 (9th Cir.1983) (per curiam); *Santana-Figueroa v. INS*, 644 F.2d 1354, 1356 (9th Cir.1981) ("When important aspects of the individual claim are distorted or disregarded, denial of relief is arbitrary."). Further, the BIA must state its reasons for denying relief and show that it has properly considered all factors. *Contreras-Buenfil*, 712 F.2d at 403; *Prapavat v. INS*, 662 F.2d 561, 562 (9th Cir.1981) (per curiam).

tions are true. The BIA's only reason for initially disregarding the advisory opinion was that Zavala-Bonilla was not credible. Once the BIA assumed that Zavala-Bonilla's contentions were true, the advisory opinion should certainly have been considered. Furthermore, our opinion also demonstrates the lack of substantial evidence for the BIA's non-credibility-related findings, *i.e.*, the BIA's discounting of the letters submitted by Zavala-Bonilla, the BIA's finding that general accounts of oppressive conditions in El Salvador were irrelevant to Zavala-Bonilla's case, the BIA's finding that Zavala-Bonilla had nothing to fear because her union joined an anti-government coalition *after* she left El Salvador, and the BIA's statement that Zavala-Bonilla needed to show that the government of El Salvador maintained a "continuing and contemporaneous cognizance" of her. Thus, the BIA's alternative finding that Zavala-Bonilla does not qualify for asylum/withholding of deportation— even assuming her contentions to be true—is clearly not supported by substantial evidence.

6. The State Department's letter should be particularly persuasive given the fact that "a frank, but official, discussion of the political shortcom-

ings of a friendly nation is not always compatible with the high duty to maintain advantageous diplomatic relations with nations throughout the world." *Kasravi v. INS*, 400 F.2d 675, 677 n. 1 (9th Cir.1968) (State Department letter submitted as evidence of likelihood that applicant would *not* be persecuted by friendly nation afforded little weight). *See also, In re Exilus*, Interim Dec. 2914 at 5–6 (BIA Aug. 3, 1982) (State Department opinions admissible as a valuable source of information). The State Department's finding favorable to Zavala-Bonilla is especially significant given this country's economic and political ties to El Salvador.

7. The *Handbook* has been treated by the BIA as a significant source of guidance with respect to the United Nations Protocol, to which the United States acceded in 1968. In 1980, the United States also conformed the wording of the asylum statute to the wording of the Protocol. *See Matter of Rodriguez-Palma*, 17 I. & N. Dec. 465, 468 (1980); *see also Stevic v. Sava*, 678 F.2d at 406 n. 6, 409.

In the instant case, the BIA found:

The respondent's extreme hardship claim is "based on her claim to persecution." However, we have just held that claim to be without merit. Apart from this persecution basis, the respondent did not specifically assert other grounds of extreme hardship. Nevertheless, upon our full consideration of all factors presented in the record, we find that the respondent clearly has failed to establish that her deportation would result in "extreme hardship" to herself within the meaning of the statute.

*In re Elisida Zavala-Bonilla,* No. A22 883 441, at 6 (BIA Oct. 5, 1982) (unpublished decision and order) (citations omitted).

Since we have concluded that Zavala-Bonilla's political persecution claim must be reconsidered, her suspension of deportation claim, based in large part on the persecution claim, must also be reconsidered on remand.

■ Further, the BIA has failed to consider all relevant factors presented by Zavala-Bonilla. "Because hardship depends on specific circumstances, *Banks v. INS,* 594 F.2d 760, 762 (9th Cir.1979), discretion can be properly exercised only if the circumstances are actually considered." *Santana-Figueroa,* 644 F.2d at 1356. Zavala-Bonilla contends that she will be completely unable to find work in El Salvador and that she has formed friendships and attachments during her fifteen years in this country. These factors are pertinent to the hardship determination, and the BIA has failed to discuss them. *See Santana-Figueroa,* 644 F.2d at 1356–7 (total inability to obtain work is more than economic detriment and the contention must be considered; effects of uprooting must be considered in combination with other factors); *Mejia-Carrillo v. INS,* 656 F.2d 520, 522 (9th Cir.1981) (personal and emotional hardship resulting from decrease in material welfare must be considered). The BIA's conclusory statement that it considered all factors fails to delineate its reasoning adequately. *Contreras-Buenfil,* 712 F.2d at 403; *Prapavat,* 662 F.2d at 562. For the

abovementioned reasons, we find that the BIA has abused its discretion in denying Zavala-Bonilla's extreme hardship claim. On remand, the BIA should consider the persecution claim and all other relevant factors in addressing the hardship claim.

Any further appeal in this matter shall be referred to this panel.

REVERSED and REMANDED for further proceedings consistent with this opinion.